IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

JESSICA BAREFIELD,                      )
                                        )
      Plaintiff,                    )
                                        )
v.                                      )     NO. 3:17-cv-01525
                                        )     JUDGE RICHARDSON
JACKIE HILLMAN and BEVERLEY             )
NORMENT,                                )
                                        )
      Defendants.                   )

## **MEMORANDUM OPINION**

Pending before the Court is Defendants' Motion for Summary Judgment (Doc. No. 58) ("Motion"). Plaintiff has filed a response in opposition (Doc. No. 67) ("Response"), and Defendants have filed a reply (Doc. No. 71).

## **BACKGROUND**

Plaintiff brought this action pursuant to 42 U.S.C. § 1983, seeking damages for the death of her son, TH, allegedly caused by Defendants in violation of the United States Constitution and federal law. Plaintiff alleged four Counts: (I) violation of substantive due process by failure to protect TH while he was in state custody; (II) violation of procedural due process; (III) violation of federal law, specifically the Adoption Assistance and Child Welfare Act ("Adoption Assistance Act" or "AAA"); and (IV) violation of substantive due process through a state-created danger. (Doc. No. 27). The Court previously dismissed Count II (violation of procedural due process) and dismissed all claims against the Commissioner of the Tennessee Department of Children's

Services ("DCS"). (Doc. No. 45). Before the Court now is a Motion filed by Defendants Hillman and Norment[1] concerning the remaining substantive due process and AAA claims against them.

Plaintiff alleges that TH was placed into the custody of DCS in October 2016, when he was adjudicated delinquent by the Davidson County Juvenile Court.[2] Plaintiff claims that TH had a history of running away from home for extended periods of time and associating with gang members. She avers that Defendants had direct knowledge of TH's gang connections and his history of dangerous runaway activities when he entered state custody. She claims that TH's runaway predilection and oppositional behavior were duly noted in the plan developed for TH by DCS. (Doc. No. 27).

The parties agree that TH ran from his first and second foster homes almost immediately, on October 23 and November 3, 2016, respectively. (Doc. No. 76 at ¶ 7). They likewise agree that a permanency plan meeting for TH was held on November 16, 2016, (Doc. No. 76 at ¶ 8), and that TH ran away again between the permanency plan meeting and the Juvenile Court hearing at which that plan was approved. (Doc. No. 68-14 at 32-33 of 80).[3] Plaintiff contends that after consultation with her (Plaintiff), around the time of the Juvenile Court hearing, DCS moved TH to the Volunteer Youth Academy ("VYA"), a secure facility with heavy locked doors to prevent youth from "absconding." (Doc. No. 27 and Doc. No. 76 at ¶ 9.). The parties agree that TH ran away from VYA in April 2017. (Doc. No. 76 at ¶ 10). Plaintiff states that she was able to find TH about a

---

[1] The Amended Complaint identifies this Defendant as Beverly Normant (Doc. No. 27), but Defendants spell her last name Norment. The Court will adopt Defendants' spelling.

[2] The record indicates that TH was found to be "dependent and neglected" after he was "abandoned" in the detention center. (Doc. No. 68-5 at 1).

[3] In citing deposition transcripts, the Court will cite to the page numbers placed on the document by the Clerk's docketing system (*e.g.*, "___ of 216").

2

week later and return him to state custody. (Doc. No. 27). Plaintiff alleges that because of Defendants' "extremely deficient placement array for delinquent males," DCS was no longer able to place TH at VYA (*Id.*). The parties agree that, instead, DCS placed TH temporarily into the foster home of Mr. Welbeck until it could get TH accepted into a Level 3 facility.[4] (Doc. No. 68 at ¶ 22).[5]

---

[4] DCS uses a level-of-services-needs model for children in its custody. The model prescribes three different levels of needs. Level 1 is the least serious needs that can be met in the community; Level 2 usually involves additional mental health services; and Level 3 reflects higher needs requiring a more structured setting. (Doc. No. 76 at ¶ 5). Notably, both parties imply that particular physical placements (and not just service packages) are described in terms of levels, with Level 3 being the most secure and Level 1 (often a foster home in the community) being the least secure.

According to Defendants, the level of services for a child is not necessarily the same as the level of physical placement for a child. (*Id.* at ¶ 6) (distinguishing a recommendation for "Level 3 services" from a recommendation for "placement in a Level 3 type facility."). It is conceivable to the Court that Defendants are being deliberately vague as to whether the temporary placement at Mr. Welbeck's home was intended to last until TH could be accepted into a facility that could provide Level 3 services or, instead, until TH could be accepted into a "Level 3 [type] facility," which, as far as the Court can tell is not necessarily the same thing. To the extent that Defendants are attempting to avoid conceding that the idea was to move TH from Mr. Welbeck's house to a Level 3 facility—*i.e.*, *a secure facility* and not just a *facility having Level 3 services*— that attempt fails. If Defendants wished to avoid conceding this, they had many chances to do so but failed to ever do so expressly; they should be deemed to have made such a concession by saying things such as "[i]t is undisputed that T.H. was only placed at Mr. Welbeck's home until placement could locate acceptance into level 3," (Doc. No. 76 at ¶ 43), and "[t]he foster care team had to wait for the placement specialist team to locate a level 3 facility." (Doc. No. 59 at 24).

[5] Doc. No. 68 at ¶ 22 constitutes Plaintiff's response to ¶ 22 of Doc. No. 58, wherein Defendant asserted that it was a genuine and undisputed fact that "[w]hen T.H. returned to DCS custody on or about April 18, 2017, DCS placement services placed him at Mr. Welbeck's foster home until they could get T.H. accepted into a facility with Level 3 services." Plaintiff responded, "Undisputed that TH was placed in a Level 1, standard foster home instead of the Level 3 placement the team and state psychologist said he needed." (Doc. No. 68 at ¶ 22). If Plaintiff meant thereby to dispute anything in Defendant's assertion in ¶ 22 of Doc. No. 58, she failed completely, because she denied nothing whatsoever.

As noted in the prior footnote, Defendants asserted a very similar fact elsewhere in Doc. No. 59, *i.e.*, that "[t]he foster care team had to wait for [DCS's] placement specialist team to locate a level 3 facility." (Doc. No. 59 at ¶ 24). Plaintiff did purport to dispute this fact. (Doc. No. 68 at

3

It is undisputed that on May 17, 2017, two DCS family service workers went to Mr. Welbeck's home to transport TH for placement at the Deer Valley Residential Treatment Facility. (Doc. No. 68 at ¶ 32). It is further undisputed that when the DCS workers explained to TH that they planned to move him, TH objected and ran away, and that on June 9, 2017, TH was found shot to death. (*Id.* at ¶¶ 34-36, 41).

DCS Administrative Policies and Procedures provide that DCS "utilizes the building, preparing and maintaining Child and Family Teams (CFT)[6] model to ensure that families and their support systems are engaged in the planning and decision-making process throughout their relationship with the Department." (Doc. No. 76 at ¶ 16; Doc. No. 68-3 at 1). The Family Services Worker ("FSW") has the primary responsibility for building, preparing and maintaining the Child and Family Team and is responsible for working with the family and team to coordinate the resources needed to meet the needs of the child and family. (*Id.* at 2 and 8). "A Child and Family Team Meeting (CFTM) is convened at certain critical junctures in the life of a case, as well as on an as-needed basis, to help the family and the department work together to achieve permanency for children as soon as possible." (*Id.*) The FSW, birth parents/guardians and family members form the core of the CFT. (*Id.* at 5). The Team Leader for the case is required to participate in all Initial CFTMs and all Initial Permanency Planning CFTMs. (*Id.* at 8). Other CFT members may include foster parents, therapists, and others in the community. (*Id.* at 5-9).

---

¶ 24). But that does her little good because, as just noted, she admitted that "[w]hen T.H. returned to DCS custody on or about April 18, 2017, DCS placement services placed him at Mr. Welbeck's foster home until they could get T.H. accepted into a facility with Level 3 services."

[6] The parties herein also refer to this team as the "foster care team."

4

Defendant Hillman was TH's assigned FSW from the time he entered state custody until approximately mid-May 2017. (Doc. No. 68 at ¶ 4). It is undisputed that TH did not incur any harm while Defendant Hillman was assigned as his FSW. (*Id.* at ¶ 27).[7] Defendant Norment was, during the relevant time period, a Team Coordinator for DCS in the foster care division.[8] (*Id.* at ¶ 5). Norment was the Team Coordinator on TH's case from the time he came into state custody until the unfortunate end. (Doc. No. 68-15 at 54 of 216).

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment. *See id.* at 248. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine[.]'" *Id.*

---

[7] Plaintiff nonetheless contends that Hillman's actions and inactions while she was TH's family services worker led to his harm.

[8] Norment testified that team coordinators supervise team leaders, who in turn supervise the family service workers (also called "case managers"). (Doc. No. 68-15 at 16 of 216). She stated that her job duties included meeting with team leaders and providing direct supervision and guidance to them. (*Id.*) She stated that team coordinators also "do a lot of data," including performance reviews of face-to-face contacts and parent-child visits and analysis of the number of children in foster care, how long they've been in foster care, the reasons they came into foster care, and whether they are moving towards their "goals."(*Id.* at 16-17). Team coordinators are not required to attend all child and family team meetings, but they do attend some. (*Id.* at 18).

5

A fact is "material" within the meaning of Rule 56(c) "if its proof or disproof might affect the outcome of the suit under the governing substantive law." *Anderson*, 477 U.S. at 248. A genuine dispute of material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Harris v. Klare*, 902 F.3d 630, 634-35 (6th Cir. 2018).

The party bringing the summary judgment motion has the initial burden of identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. *Pittman v. Experian Info. Sol., Inc.*, 901 F.3d 619, 627-28 (6th Cir. 2018). If the summary judgment movant meets that burden, then in response the non-moving party must set forth specific facts showing that there is a genuine issue for trial. *Id*. at 628.

A party asserting that a fact cannot be or genuinely is disputed—i.e., a party seeking summary judgment and a party opposing summary judgment, respectively—must support the assertion by citing to materials in the record, including, but not limited to, depositions, documents, affidavits or declarations. Fed. R. Civ. P. 56(c)(1)(A).

The court should view the facts and draw all reasonable inferences in favor of the non-moving party. *Pittman*, 901 F.3d at 628. Credibility judgments and weighing of evidence are improper. *Hostettler v. College of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018). As noted above, where there is a genuine dispute as to any material fact, summary judgment is not appropriate. *Id*. The court determines whether sufficient evidence has been presented to make the issue of fact a proper jury question. *Id*. The mere existence of a scintilla of evidence in support of the nonmoving party's position will be insufficient to survive summary judgment; rather, there must be evidence upon which the jury could reasonably find for the nonmoving party. *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003).

6

## QUALIFIED IMMUNITY

Defendants argue that they are entitled to qualified immunity as to the constitutional claims against them. Qualified immunity protects government officials from civil suits for damages, so long as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Rieves v. Town of Smyrna, Tennessee*, 959 F.3d 678, 695 (6th Cir. 2020) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity shields the official not only from liability but also from the burdens of litigating the suit altogether. *Id.* When defendants allege qualified immunity as a defense, the plaintiffs bear the burden of showing that the defendants are not entitled to qualified immunity. *Id.; see also Barton v. Martin*, 949 F.3d 938, 947 (6th Cir. 2020) ("After a defending officer initially raises qualified immunity, the plaintiff bears the burden of showing that the officer is not entitled to qualified immunity.").

The Court is required to employ a two-part test to determine whether a government official is entitled to qualified immunity. *Rieves*, 959 F.3d at 695. It must consider (1) whether the official's conduct violated a constitutional right, and (2) whether that constitutional right was clearly established. *Wright v. City of Euclid, Ohio*, 962 F.3d 852, 864 (6th Cir. June 18, 2020); *see also Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (holding that the two qualified immunity prongs may be considered in either order).

Therefore, to survive a summary judgment motion, the plaintiff must make a sufficient showing that (1) the defendant violated a constitutional right and (2) that right was clearly established. In other words, the plaintiff must, at a minimum, offer sufficient evidence to create a "genuine issue of fact;" that is, "evidence on which [a] jury could reasonably find for the plaintiff." *Richards v. Cty of Washtenaw*, --- F. App'x ---, 2020 WL 3446168, at *2 (6th Cir. June 24, 2020)

7

(citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). If the district court finds that the plaintiff's evidence could support a jury's finding that the defendant violated a clearly established right, the court must deny summary judgment. *Id.* (citing *DiLuzio v. Vill. of Yorkville*, 796 F.3d 604, 609 (6th Cir. 2015)).[9]

A. <u>Violation of Constitutional Right</u>

Plaintiff alleges that Defendants violated TH's substantive due process rights. Substantive due process bars certain government actions regardless of the fairness of the procedures used to implement them. *Hancock v. Miller*, No. 2:19-cv-00060, 2020 WL 1493609, at *12 (M.D. Tenn. Mar. 27, 2020), *appeal docketed,* No. 20-5422 (6th Cir. Apr. 24, 2020) (citing *Guertin v. State*, 912 F.3d 907, 918 (6th Cir. 2019)). Substantive due process "'specifically protects those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed.'" *Id.* (quoting *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997)).[10] One of these fundamental rights is the right of a child "to be free from the infliction of

---

[9] The Court will assume that on the issue of whether a summary judgment movant is entitled to qualified immunity, the ordinary rule that the defendant-movant has the initial burden of showing the absence of a genuine issue of material fact does not apply and that, instead, the burden falls initially on the plaintiff. The assumption is not particularly unwarranted, given the unique nature of the doctrine of qualified immunity and particular language concerning the availability of summary judgment on qualified-immunity grounds found in some opinions. *See, e.g., Barton*, 949 F.3d at 948 (stating that the defendant was entitled to qualified immunity "unless [plaintiff] has shown that a reasonable jury could find that [defendant] violated his Fourth Amendment right against warrantless entry and that the right was clearly established at the time of the violation."). It is certainly questionable, though, given how Sixth Circuit cases often proceed as if qualified immunity is generally subject to the standard rules governing summary judgment motions. *See, e.g., Jones v. Clark Cty., Kentucky*, 959 F.3d 748, 765 (6th Cir. 2020) [hereinafter "*Clark Cty.*"].

[10] Substantive due process also protects less significant (*i.e.*, non-fundamental) liberty interests, but only to a lesser extent. *See, e.g., Johnson v. City of Cincinnati*, 310 F.3d 484, 515–16 (6th Cir.

8

unnecessary harm" while in a state-regulated foster home. *Id.* (citing *Meador v. Cabinet for Human Resources*, 902 F.2d 474, 476 (6th Cir. 1990)). Plaintiff asserts that Defendants violated TH's substantive due process rights in two ways—by failing to protect him and through a state-created danger. (Doc. No. 27, Counts I and IV).

Generally, a state has no constitutional duty to protect individuals from a private party's violence. *Doe v. Jackson Local Sch. Dist. Bd. of Educ.*, 954 F.3d 925, 931 (6th Cir. 2020) ("*Jackson*") (citing *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 195 (1989)). The plain language of the Due Process Clause, which restricts deprivations *by the state*, imposes a limitation on the state's power to act, not a guarantee of certain minimal levels of safety and security. *Id.* The Due Process Clause's purpose is "to protect the people from the State, not to ensure that the State protects them from each other." *DeShaney*, 489 U.S. at 196, *cited in Jasinski v. Tyler*, 729 F.3d 531, 538 (6th Cir. 2013).

For example, in *DeShaney*, the Court held that social workers did not violate a child's substantive due process rights when they failed to protect him from his father's abuse, even though the state knew about the abuse and did not remove the child from harm's way. *Estate of Romain v. City of Grosse Pointe Farms,* 935 F.3d 485, 492 (6th Cir. 2019); *Jackson*, 954 F.3d at 931. The Court distinguished DeShaney from individuals (such as prisoners) who are in state custody and whom a state has a constitutional duty to protect. *Id.*; *Lipman v. Budish,* 383 F. Supp. 3d 764, 772 (N.D. Ohio 2019) (State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause).

---

2002) (explaining that government infringement on non-fundamental liberty interests will be upheld as constitutional so long as it is "rationally related to legitimate government interests").

Courts, including the Sixth Circuit, have endorsed two exceptions whereby state actors have an affirmative duty of protection—where they have a "special relationship" with an individual, [11] or where their conduct toward the individual resulted in a "state-created danger." *M.J. v. Akron City Sch. Dist. Bd. of Educ.,* Case Nos. 5:18-cv-577 and 5:18-cv-870, 2020 WL 2043321, at * 11 (N.D. Ohio Apr. 28, 2020) (citing *Brooks v. Knapp*, 221 F. App'x 402, 406 (6th Cir. 2007)); *Hudson v. Hudson*, 475 F.3d 741, 745 (6th Cir. 2007) ("We recognize two exceptions to this rule: (1) when the state has a special relationship to the victim, and (2) when the state creates the danger that led to the victim's harm.").[12] Thus, although a plaintiff could perhaps seek to show a "failure to protect" in order to help establish one of these two exceptions, "failure to protect" is not an exception itself and thus is not a valid theory of recovery. Therefore, Plaintiff's separately

---

[11] The idea behind the special-relationship theory is that "[w]hen the State has so restrained the liberty of the individual that it renders him unable to care for himself, the State has a special relationship with the individual and thus an affirmative duty to protect him." *Jones v. Reynolds*, 438 F.3d 685, 690 (6th Cir. 2006) [hereinafter "*Reynolds*"]. Thus, the quintessential example of a "special relationship" between a government and a person is when the government obtains custody over the person. *Doe v. Hamilton Cty. Bd. of Ed.*, 329 F. Supp. 3d 543, 575 (E.D. Tenn. 2018); *Lipman,* 383 F. Supp. 3d at 773 ("[A] duty to protect may arise when an individual is placed in the custody of the state."); *M.J.*, 2020 WL 2043321, at *11 ("It is well settled that forced or involuntary custody is necessary to establish a special relationship with the state.")

The Court has serious doubts as to whether the special-relationship test would apply here, because when T.H. was killed, he was on the run—and not subject to any restraint on liberty, including the restraint(s) to which he would have been subject had he not run. But in any event, it does not appear that Plaintiff has asserted the special-relationship theory, and the Court will not rely on it in rendering its decision on the Motion. Notably, by contrast, the state-created danger theory, by its very nature, is not rendered inapplicable merely because the harm occurred while the individual was not subject to a state-imposed restriction on the individual's liberties.

[12] As suggested above, the "special relationship" exception applies to plaintiffs who were, at the relevant times, in state custody, and the "state-created danger" exception applies to plaintiffs who were, at the relevant times, *not* in custody. *See Estate of Romain,* 935 F.3d at 493 (Murphy, J., concurring).

asserted claim for failure to protect (Count I) has no merit, and Defendants will be entitled to summary judgment on that claim.

Plaintiff also claims, however, that Defendants violated TH's substantive due process rights through a "state-created danger" that ultimately led to his harm. As noted above, the state-created danger theory serves as an "exception to the prohibition against holding public officials constitutionally responsible for private acts of violence." *Jones v. Reynolds*, 438 F.3d 685, 690 (6th Cir. 2006).[13] The state-created danger doctrine allows plaintiffs to bring due process claims for harms caused by private actors, "an anomaly because neither the Fourteenth Amendment nor § 1983 regulates private actors." *Estate of Romain*, 935 F. 3d at 491.

"Liability under the state-created-danger theory is predicated upon affirmative acts by the state which either create or increase the risk that an individual will be exposed to private acts of violence." *Doe v. Hamilton Cty. Bd. of Ed.*, 329 F. Supp. 3d 543, 575 (E.D. Tenn. 2018) ("*Hamilton*"). If the government plays a role in creating a situation that could give rise to an attack by private persons, it is obliged to prevent such injury. *Id.* The focus, then, is not necessarily on later governmental inaction, but rather on the initial act of creating a dangerous situation for private violence. *Id*. If a state "creates a perilous situation" that renders a citizen more vulnerable to danger at the hands of private actors, a plaintiff may bring a substantive due process claim. *Doe v. Trumbull Cty. Children's Servs. Bd.,* No. 4:13CV00768, 2013 WL 6903777, at *5 (N. D. Ohio Dec. 31, 2013).

---

[13] This general prohibition follows from the fact that "nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors." *DeShaney*, 489 U.S. at 195; s*ee also Reynolds*, 438 F.3d at 690 (quoting this observation from *DeShaney*).

11

To prove a due process claim using a state-created-danger theory, a plaintiff must show (1) an affirmative action[14] (2) that creates a foreseeable risk of (3) a special danger. *Hamilton*, 329 F. Supp. 3d at 576 (quoting *McQueen v. Beecher Cmty. Sch.*, 433 F.3d 460, 464–470 (6th Cir. 2006)). Moreover, there must be some culpability on the state actor's part. *Hamilton*, 329 F. Supp. 3d at 576.[15] Put another way, an official must initially take an affirmative act that either creates or increases the risk that the plaintiff will be exposed to private acts of violence; this risk of private acts of violence must rise to the level of a "special danger" to a specific victim that exceeds the general risk of harm the public faces from the private actor; and when exacerbating this risk of harm, the official must act with a sufficiently culpable state of mind. *Jackson*, 954 F.3d at 932.

Describing the elements yet another way, and in a different order than was presented in *Hamilton* (but not *Jackson*), the Sixth Circuit has stated: "To bring a 'state created danger' claim, the individual must show: '(1) an affirmative act by the state which either created or increased the risk that the plaintiff would be exposed to an act of violence by a third party; (2) a special danger to the plaintiff wherein the state's actions placed the plaintiff specifically at risk, as distinguished from a risk that affects the public at large; and (3) the state knew or should have known that its actions specifically endangered the plaintiff.'" *Jones*, 438 F.3d at 690 (quoting *Cartwright,* 336 F.3d at 493). The Court declines to embrace this particular statement of the elements because its

---

[14] A failure to act is not an affirmative act under the state-created danger theory. *Engler v. Arnold*, 209 F. Supp. 3d 988, 992 (N.D. Ohio 2016) (citing *Cartwright v. City of Marine City*, 336 F.3d 487, 493 (6th Cir. 2003)). Here, Plaintiff alleges more than a mere failure to act; she alleges that Defendants affirmatively acted by purposefully placing TH in a Level 1 foster home after he was back in state custody upon his apprehension from running away from VYA.

[15] A "special danger" merely means "the state's actions place the victim specifically at risk," as opposed to a risk "that affects the public at large." *McQueen,* 433 F.3d at 468. This meaning of "special danger" is clearly reflected in *Reynolds*'s description above of the second element of a state-created danger claim

12

third element—"knew or should have known"—implies a negligence standard, and (as subsequent cases have made clear) negligence cannot be the basis for a substantive due process claim. *See Jackson*, 954 F.3d at 931 ("A should-have-known framework comes close to 'suggest[ing] a classic negligence formulation.'"); *see also Estate of Romain*, 935 F.3d at 493 (Murphy J., concurring) (same).

For a state-created-danger claim to survive, then, there must be some culpability on the state actor's part. Courts have described this requirement in different ways. *See Jackson,* 954 F.3d at 932 (citing cases). For example, some courts say that the affirmative governmental action must have been "so 'egregious' that it can be said to be arbitrary in the constitutional sense." *Hamilton*, 329 F. Supp. 3d at 576 (quoting *McQueen*, 433 F.3d at 469) (internal quotation marks omitted). The Supreme Court has indicated that the Constitution sets a "high bar" for this sort of claim, holding that a state actor's conduct violates the Due Process Clause only if it is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience. *Jackson*, 954 F. 3d at 932-33.

Other courts making this determination (as to a state action that was not a "split-second decision") have applied a "subjective recklessness" standard. For example, *Hamilton* and *McQueen* have embraced this standard while also paying homage to the "egregious" standard. *See Hamilton*, 329 F. Supp. 3d at 576. "An official acts with 'subjective recklessness' if he acts in the face of an 'inference' that a risk for '*serious harm*' exists and he is aware of it." *Id.*at 577. To show subjective recklessness, the plaintiff must do so 'circumstantially' and proffer evidence that would permit a reasonable fact finder to conclude that the risk of 'serious harm' . . . '*was so obvious* that the official had to have known about it.'" *Id.* (quoting *McQueen*, 433 F.3d at 466)).

The Sixth Circuit has described the standard as "deliberate indifference" [16] in the "state-created danger" context, at least where officials have the opportunity for reflection and unhurried judgments. *Jackson*, 954 F. 3d at 933; *McQueen*, 433 F.3d at 469; *M.J.,* 2020 WL 2043321, at * 13 ("In situations where there is opportunity for reflection, the guiding principle is 'deliberate indifference,' which the Sixth Circuit has equated with 'subjective recklessness.'"). The Sixth Circuit has explained that there is no "calibrated yard stick" for evaluating whether state action meets this standard. *Id.* "To aid navigation through these murky waters," the Sixth Circuit explained that the deliberate indifference standard (in state-created danger cases) contains two separate components (the first of which itself has two components). *Id.* (citing *Jackson*, 954 F.3d at 933). First, an official must be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and she must also draw the inference. Secondly, having drawn that inference, the official must act or fail to act[17] in a manner demonstrating "reckless or callous indifference toward the individual's rights."[18] *Id.*; *Jackson*, 954 F.3d at 933. To act with

---

[16] In choosing the deliberate indifference standard, courts analogize the state's role in placing children in foster homes to the mental institution and prison settings in which state liability has been clearly established for deliberate indifference to the plight of the individuals in detention. *Lintz v. Skipsi*, 25 F.3d 304, 305 (6th Cir, 1994). In the separate context of the Eighth Amendment, the deliberate indifference standard describes a state of mind more blameworthy than negligence, meaning the government official knows of and disregards an excessive risk to the safety of another. *Millinder v. Hudgins*, 421 F. Supp. 3d 549, 560 (W.D. Tenn. 2019). Ordinarily, "deliberate indifference" means that the defendant both knew of and consciously disregarded the known risk to the victim. *Kollaritsch v. Michigan State Univ. Bd. of Trustees*, 944 F.3d 613, 621 (6th Cir. 2019).

[17] The inclusion, in this part of the opinion in *M.J.* of "fail to act" is inconsistent with that opinion's earlier statement that failure to act is not an affirmative act under the state-created danger theory, and so the Court will not consider any failure to act for these purposes.

[18] Here, notably, the opinion in *MJ* appears to equate indifference towards an individual's rights with indifference towards a risk of harm to the individual.

14

"reckless or callous indifference," a public official must do more than be aware of a substantial risk of serious harm. The official's response to that harm must also be "conscious shocking." *M.J.*, 2020 WL 2043321, at *13.

Plaintiff contends that Defendants consciously disregarded TH's high risk of running away, thus increasing the risk of harm, by placing him in Mr. Welbeck's foster home (from where he could run) rather than immediately placing him in a more secure facility (from where he generally could not run as a practical matter). There is no question that Defendants knew of TH's high risk of running away; his running away was at least part of the reason he was placed in state custody in the first place, he ran from every other placement, and his plan clearly stated that he was a risk for running away.[19] And there is no question that Defendants knew of the risk of harm to TH if he ran. DCS policy specifically states that youth who run are susceptible to exploitation and harm. (Doc. No. 76 at ¶ 31). Defendant Hillman testified that she was afraid TH would run if he were placed in a foster home and that she was concerned that he would not be safe in the streets. (Doc. No. 68-14 at 61 of 80). Hillman also testified that a lot of things can happen to a child who runs away, including "be[ing] killed." (*Id.* at 70 of 80). Clearly Defendants knew of the risks of TH running away and TH's being harmed, even killed, if he ran away. The issue is whether Defendants consciously disregarded those known risks.

Here, there is evidence from which a jury could find such conscious disregard; *i.e.*, evidence that when TH was apprehended after his run from VYA, Defendants were responsible

---

[19] Defendants cite cases such as *Lintz,* in which defendants knew only about accusations, not actual harm, and took action when confronted with those accusations. Here, Defendants knew of more than accusations; they knew of TH's history of running away and participating in gang activities. And Plaintiff alleges they did nothing.

for releasing him into a non-secure facility (Mr. Welbeck's home)[20] rather than a secure (Level 3) facility as required to mitigate the known risk. As discussed below, a jury could find Defendants responsible for the decision to place TH (temporarily) in Mr. Welbeck's home and that this decision reflected conscious disregard of the known risk to TH.

Defendants rely heavily on their assertion that they were not responsible for placing TH. They argue that child placement is the job of the placement specialist team and not of the foster care team, including both Defendants. Plaintiff disputes this assertion. (Doc. No. 68 at ¶¶ 7-9). Norment testified that the placement specialists, of which there are 6-7 in Davidson County, "seek placement for children who enter custody." (Doc. No. 68-14 at 30-32 of 216). She stated that a placement specialist is utilized in connection with every placement and agreed that the "whole job" of the placement specialist is to locate placements that are appropriate based upon the information the CFT (also called the "foster care team," as noted above) provides. (*Id.* at 31-32).

Ms. Norment testified that the foster care team provides the placement team whatever information it needs and requests the level of placement it feels the child needs; and the placement team looks for the placement the foster care team has requested. (Doc. No. 68-15 at 163 of 216).[21] Norment testified that the placement team does not just randomly place children; they look at safety and do "their very best to make the effort to place a child as safe as they can at that particular day and time." (*Id.* at 167). She agreed that, if she thought a specific suggested placement from

---

[20] The Court notes, however, that the placement at Mr. Welbeck's house *in particular* does not reflect a conscious disregard. Along those lines, the Court notes that it has seen no allegation or information whatsoever suggesting that anything Mr. Welbeck did with regard to TH was improper or led to TH's running away or that Defendants would have had any reason to believe that Mr. Welbeck would do anything improper or would lead to TH running away.

[21] "I'm going to do everything I can to provide our placement what they need to get the level of services that, as a team, we feel the child needs." (Doc. No. 68-15 at 162 of 216).

the placement team was not appropriate, she could have a conversation with the placement team about other placements she felt would be better. (*Id*. at 167-69 of 216). But she also stated that it is not her role to look for placement. (*Id*. at 172 of 216). She testified that, once they get the "referral packet," it is the placement team's responsibility to look for a placement. (*Id*. at 173 of 216). "It is not the responsibility of the foster care team to place the child. As far as the foster care team, it is our responsibility, to the best of our ability, to do whatever we can to ensure the safety of our children, but to find a safe placement, the placement process is not our responsibility. That is not our role." (*Id*. at 175 of 216). Defendants do not dispute, however, that per DCS policy, upon return of a child from a runaway episode, the family services worker (in this case, Hillman) ensures an immediate safe placement is available. (Doc. No. 76 at ¶ 32). Hillman testified that after the placement specialists receive the placement packet, they do contact her and follow-up. (Doc. No. 68-14 at 30 of 80). She stated that she could contact placement if she had special concerns, but she normally informed her supervisor instead. (*Id*. at 31 of 80).

Plaintiff contends, and Defendant does not dispute, that DCS relies on a team model to provide services for foster children, a model that emphasizes "collaborative and open casework." (Doc. No. 76 at ¶ 16).[22] Plaintiff asserts that the CFT (foster care team) is designed to keep foster children safe and to make sure their needs are met. (Doc. No. 76 at ¶ 2). The parties do not dispute (for purposes of summary judgment) that a team meeting should occur when there is a change in placement to assess whether that placement is meeting the child's needs and to determine what DCS and the team can do to support the placement if it is appropriate, or, if not, to help identify a more appropriate placement for the child. (Doc. No. 76 at ¶ 22).

---

[22] "Collaboration among team members from different agencies is essential." (Doc. No. 76 at ¶19).

Plaintiff asserts that, per DCS policies, the foster care team, including Hillman and, in this case, Norment (Doc. No. 76 at ¶ 2), plays a crucial role in the placement process to ensure that the specific placement is appropriate to meet the child's needs and then to assess, over time, whether the placement is meeting the child's needs. (Doc. No. 68 at ¶¶ 7-8.) It is undisputed that DCS protocol requires the family services worker (in this case, Hillman) to convene a team meeting when a youth returns from runaway and placement is disrupted, preferably before the child is placed again. (Doc. No. 76 at ¶ 33). It is also undisputed that DCS staff, including Defendants, may appeal placement and levels of care decisions if they feel those are inappropriate. (Doc. No. 76 at ¶ 24). For all of these reasons, a jury could find Defendants responsible for the decision to release TH temporarily to a non-secure facility.

There likewise is evidence from which a jury could conclude that this decision reflected conscious disregard of the risks to TH from that temporary placement. As noted above, Plaintiff alleges that "placing TH in an insecure foster home from which he could simply walk away" either created or increased the risk that TH would be exposed to an act of violence by a third party. (Doc. No. 27 at ¶ 61).[23] Plaintiff basically asserts that had Defendants been sufficiently concerned about TH's risk of harm, they could and would have influenced—or, at a minimum, communicated with—the placement team to provide a safe, temporary, placement for TH (*i.e.*, a Level 3 facility) to which he could be directly released when apprehended after his runaway from VYA so that he would never have been in a facility from which he could run. There is evidence here to create a genuine issue of material fact as to whether Defendant could and should have done these things.

---

[23] In other words, Plaintiff contends that if TH had been placed directly in a more secure facility after being apprehended from running away from the VYA, the last runaway (and his death) could have been prevented.

18

Plaintiff also argues that Defendants were deliberately indifferent to the risks of harm and to TH's needs long before TH ran away the final time,[24] by choices such as failing to follow DCS policies, failing to hold required meetings, failing to interact with and encourage the "placement team" to assure TH's appropriate and prompt placement in a safe environment, and failing throughout the time TH was in their custody to adequately address the risk of his runaway behavior. *See, e.g.*, Docket No. 76 at ¶¶ 6-9, 11-14, 22, 25-26, 29-33. There is evidence that these choices were made, that Defendants are responsible for these choices, and that these choices further manifest deliberate indifference to a risk of harm to TH. Plaintiff has carried her burden to show a genuine issue of material fact as to deliberate indifference regarding these choices as well.

Defendants argue, among other things, that TH had run away from a Level 3 facility before, implying that even if they had placed him immediately in a Level 3 facility without placing him at Mr. Welbeck's home, he still could have run away, with the same or a different result. It may be that direct placement at a Level 3 facility would not have guaranteed TH's safety. But that does not change the fact that a jury could find that the decision to place him temporarily in a non-secure facility rather than in a Level 3 facility (where, it appears undisputed, his risk of running would have been substantially decreased) reflected deliberate indifference.

Defendants assert that they believed TH was getting along well with Mr. Welbeck and had indicated he wanted to stay there.[25] But this assertion proves too much. Defendants are clear that when TH was placed temporarily at Mr. Welbeck's, it was with the full expectation he would be

---

[24] That is to say, Plaintiff claims that Defendants' deliberate indifference to the substantial risk to TH was manifested even prior to the last affirmative act of placing him directly in a non-secure facility rather than a Level 3 facility.

[25] This sentiment is supported by the undisputed fact that TH did not attempt to run away until Defendants tried to remove him from Mr. Welbeck's home.

moved to a Level 3 facility. So if TH, liking his temporary placement at Mr. Welbeck's, did not want to move to the Level 3 facility, that would actually enhance the very risk upon which Plaintiff's theory rests—that TH would run from an unsecure facility and then get hurt as a result. The Court finds that Plaintiff has sufficiently demonstrated that there are genuine issues of material fact as to whether the totality of Defendants' alleged actions amounted to deliberate indifference to the risk of serious harm to TH,[26] resulting in a state-created danger for which Defendants are responsible.

For example, there are questions about what options were realistically available for TH's placement after he ran away and whether Defendants appropriately impressed upon the placement team the immediacy and seriousness of the need for secure placement. There are issues regarding whether the foster care team held review meetings in accordance with TH's plan and whether that plan was ever updated after any of the several times TH ran away. There are factual questions about whether the services provided to TH while he was in state custody adequately prevented him from harm or danger. These issues cannot be decided on a motion for summary judgment.

The Court finds that genuine issues of material fact exist as to whether Defendants are liable for harm to TH, through the state-created danger exception to the prohibition against liability for government officials based on the actions of third parties. Plaintiff has carried her burden to point to sufficient evidence to demonstrate that these questions—including whether affirmative acts of state officials either created or increased the serious risk that TH would be subject to private acts of violence, and whether Defendants are responsible for these affirmative state acts—must be determined by a jury. In other words, the trier of fact must determine whether, under the

---

[26] Liability requires that the danger thus created be "foreseeable." Whether Plaintiff, having shown a genuine issue of material fact as to other requirements, also satisfies the foreseeability requirement is a question the Court addresses below.

circumstances and given what they knew, Defendants are liable for the alleged violation of TH's substantive due process rights.

B. Clearly Established

For purposes of the qualified immunity analysis, Plaintiff must also show that TH's substantive due process rights were clearly established. A right is clearly established when a reasonable officer would know—in the given situation and with the information known to him at the time—that his conduct violated that right. *Rieves*, 959 F.3d at 695. If reasonable officials could disagree as to whether the conduct at issue was lawful, then qualified immunity applies. *Id.* (citing *Waters v. City of Morristown*, 242 F.3d 353, 360–61 (6th Cir. 2001)). The Court must examine whether the contours of TH's constitutional rights were "sufficiently defined to give a reasonable official fair warning that the conduct at issue was unconstitutional." *Wright*, 962 F.3d at 869. That is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in light of pre-existing law, the unlawfulness must be apparent. *Id.*

But given that this is a summary judgment motion, the Court must consider this question not as it would at trial, but rather under applicable summary judgment standards. This means, as the Sixth Circuit recently noted:

> [C]ourts "should not grant summary judgment on the issue of qualified immunity if there exists a genuine issue of material fact, 'involving an issue on which the question of immunity turns, such that it cannot be determined before trial whether the defendant did acts that violate clearly established rights.' " *Id.* (quoting *Poe v. Haydon*, 853 F.2d 418, 426 (6th Cir. 1988)). A defendant is only entitled to summary judgment "if discovery fails to uncover evidence sufficient to create a genuine issue as to the truth of the allegations that the defendant in fact committed acts that violate clearly established law." *Poe*, 853 F.2d at 425.

*Clark Cty.* , 959 F.3d at 765. And, as noted above, the court should view the facts and draw all reasonable inferences in favor of the non-moving party, Plaintiff. *See Pittman*, 901 F.3d at 628.

Defendants assert that there was no clearly established right in this case. But the state-created danger exception was clearly established as a legal doctrine years before the Defendants' alleged constitutional violations in this case. As explained above, the Sixth Circuit is one of numerous courts that, following *DeShaney*, endorsed two exceptions to the notion that state actors have no duty to protect individuals from private violence. *DeShaney* was decided in 1989. Since that time and certainly at the times in question here, as indicated by the discussion and citations above, the right to be protected from state-created danger has become clearly established.

And the Court finds that Plaintiff has shown genuine issues of fact as to whether a reasonable officer in Defendants' respective positions would know that her actions brought her within the scope of that theory. That is, Plaintiff has pointed to sufficient evidence that such an officer would know that, under the circumstances of which Defendants were aware, choosing to place TH temporarily in a non-secure facility rather than directly placing him in a secure facility would spawn a state-created danger, *i.e.,* create a serious risk of danger and resulting harm. Whether the evidence is sufficient for Plaintiff to prevail at trial is a question for another day. [27]

As noted above, if the district court finds that the plaintiff's evidence could support a jury's finding that the defendant violated a clearly established right, the court must deny summary

---

[27] Arguably, the test here is not, strictly speaking, whether Plaintiff has raised a genuine issue of material fact such that *a* fact-finder *could* make this finding, but rather whether *the court*, viewing the evidence in Plaintiff's favor, *does* make this finding. *See Margeson v. White Cty., Tenn.*, 579 F. App'x 466, 471 (6th Cir. 2014) (stating on appeal of denial of officers' motion for summary judgment, that where the right at issue is a clearly established constitutional right, "the central question in this case is whether the [o]fficers' actions amounted to a violation of that right, when viewing the facts in the light most favorable to [Plaintiff]."). To the extent that this is the test, the Court does find—*viewing the evidence in Plaintiff's favor as required*— that Defendants' actions amounted to a violation of TH's substantive due process right to be free from state-created danger and that such right was clearly established.

judgment. *Richards,* 2020 WL 3446168, at *2. Plaintiff has carried her burden to show that there are questions of fact precluding Defendants' entitlement to qualified immunity. Therefore, Defendants will not be granted summary judgment based on qualified immunity.

## SUPERVISOR LIABILITY

Defendants contend that Norment, as a supervisor, cannot be liable under a theory of *respondeat superior* for the harm to TH; that is, Norment cannot be liable simply because she supervised other persons who may have violated TH's constitutional rights. Plaintiff asserts, however, that Norment was a hands-on member of TH's foster care team from beginning to end; in other words, Plaintiff is claiming that Norment is liable for *her own actions and inactions*. (Doc. No. 68 at ¶ 28).

There are issues of fact as to Norment's role and involvement with TH's care. For example, Plaintiff has shown that Norment receives the initial intake packet on a child brought into custody (Doc. No. 68-15 at 57 of 216), and Norment can call a foster care team meeting for a child at any time to discuss the child's needs. (Doc. No. 68 at ¶ 27). Norment testified that she does not prepare the referral packet for the placement team (Doc. No. 68-15 at 34 of 216), but she also stated, "we do everything we can" to provide "any service that we can do for them in the community." (*Id.* at 50 of 216). Norment further stated: "When they return from the run, we have to place the child, so we're going to contact placement, and we're going to be looking for placement." (*Id.* at 161-62 of 216). She said that if a child were in imminent risk of danger or harm, she could refer him to Child Protective Services to remove him from the situation. (*Id.* at 53). Norment was aware that TH wanted to leave VYA and go home and that, after he ran away, Hillman asked Plaintiff to take TH back (at Plaintiff's home) with DCS providing intensive services (instead of finding another secure facility). (*Id.* at 150 and 155).

23

Plaintiff contends that Norment authorized and/or acquiesced in every decision Hillman and the foster care team made and also actively participated in two of the three team meetings about TH. As indicated above, Norment testified that if she thought a placement was not appropriate, she could have a conversation with the placement team about changing it. She could have called a team meeting if she had felt that TH was in danger. In other words, Norment's testimony suggests that she could have taken more or different actions to protect TH. The Court finds that there are genuine issues of material fact as to Norment's personal involvement, direct action, and inaction in TH's case.

Thus, Defendant Norment's liability is alleged, with evidentiary support, to result from something other than her status as supervisor. Accordingly, Defendant Norment is not entitled to summary judgment based on the inability to hold her liable specifically as a supervisor under a *respondeat* superior theory.

## **CAUSATION**

Another issue presented by this Motion is that of causation. Defendants argue that even if they were deliberately indifferent to TH's constitutional rights, that deliberate indifference was not the cause of TH's harm. Defendants argue that Plaintiff cannot establish that anything they did or failed to do was the actual or legal cause of TH's death. This issue also involves genuine issues of material fact.

"Causation in the constitutional sense is no different from causation in the common law sense." *King v. Zamiara*, 680 F.3d 686, 695 (6th Cir. 2012) (quoting *McKinley v. City of Mansfield*, 404 F.3d 418, 438 (6th Cir. 2005)). An officer may therefore be liable under § 1983 for the natural consequences of his actions. *Id.* This includes liability for acts giving rise to the ultimate harm, even if the harm is executed by someone else. *Powers v. Hamilton Cty. Pub. Defender Comm'n,*

501 F.3d 592, 609 (6th Cir. 2007) ("Even if an intervening third party is the immediate trigger for the plaintiff's injury, the defendant may still be proximately liable, provided that the third party's actions were foreseeable."); *see also Kathawa v. Friedman*, No. 18-13026, 2020 WL 59696, at *6 (E.D. Mich. Jan. 6, 2020) (defendants do not need to be "the immediate trigger" for plaintiff's injury, so long as defendants should have reasonably foreseen that their false statements would lead to the adverse actions taken against plaintiff); *Farmer v. Parker*, No. 3:12-cv-00489, 2014 WL 690728, at *7 (M.D. Tenn. Feb. 21, 2014) (Section 1983 causation question is a matter of foreseeability, asking whether it was reasonably foreseeable that the complained of harm would befall the plaintiff as a result of the defendant's conduct).

Defendants contend that TH was able to run away not because of any lack of supervision or structure in Mr. Welbeck's foster home or because of anything Defendants did. Defendants also contend that TH's death was caused by intervening acts of TH himself and others. Defendants posit that their actions are too "far removed" from the harm incurred by TH to be the cause of that harm.[28] Plaintiff, on the other hand, argues that it was entirely foreseeable that TH might run away from the foster home (where he was located allegedly because of Defendants' deliberate indifference) and get killed,[29] and that therefore Defendants could be liable despite the intervening third-party actions.

---

[28] As explained above, Defendants argue that it was the responsibility of the placement team to place TH and that therefore any harm was not caused by Defendants. In so arguing, Defendants apparently submit that fault lies with the placement team. Again, Plaintiff has demonstrated genuine issues of material fact as to what role Defendants played in the interim placement of TH at a Level 1 facility. In any event, as stated below, this is a question not of comparative fault under state law, but rather a Section 1983 issue.

[29] It is true that TH did not run away from the foster home specifically because *he wanted to leave the foster home*; he actually wanted to remain to there. Instead, TH ran away from the foster home

Causation is a jury question unless the uncontroverted facts and inferences to be drawn from them make it so clear that all reasonable persons must agree on the proper outcome. *Wildasin v. Mathes*, No. 3:14-cv-02036, 2019 WL 2269878, at *8 (M.D. Tenn. May 28, 2019); *see also Clay v. Weidner*, No. 1:19CV1916, 2020 WL 3259147, at *9 (N.D. Ohio June 16, 2020) (citing *Harris v. Bornhorst*, 513 F.3d 503, 519 (6th Cir. 2008)). The Court finds that there are genuine issues of material fact here as to whether Defendants' conduct was a proximate cause of TH's death; in other words, whether it was reasonably foreseeable, given his history, Defendants' knowledge, and all the circumstances, that—as a result of his temporary placement—TH would run away and be hurt or killed, is a question for the trier of fact.[30]

But-for causation likewise is a question for the trier of fact. TH's running away occurred during an attempt to transport him from a foster home to a more secure placement. A factfinder could conclude that absent Defendants' (alleged) deliberate indifference, TH would have been directly transported to a Level 3 (or other relatively secure) facility after having been apprehended the last time, in which case he would not have (been able to) run away as he did and would not have been killed.

The Court cannot find that "the uncontroverted facts and inferences to be drawn from them make it so clear that all reasonable persons must agree on the proper outcome" as to this issue. *See Wildasin,* 2019 WL 2269878, at *8. Therefore, because there are genuine issues of material fact

---

*to avoid transfer to the Level 3 facility*. But the fact remains that he was able to run, and did run, from the foster home.

[30] Because comparative fault has been asserted by the parties, the Court pauses to note that it is well-settled that comparative fault does not apply to damages for violations of federal constitutional rights. *Blair v. Harris*, 993 F. Supp. 2d 721, 727 (E.D. Mich. 2014) (citing *McHugh v. Olympia Entertainment, Inc.*, 37 F. App'x 730 (6th Cir. 2002)). Accordingly, comparative fault standards have no application in this case.

as to causation, Defendants cannot be granted summary judgment based on the causation issue. And because, as discussed above, they likewise cannot be granted summary judgment based on the other issues they have raised, the Motion is denied with respect to Plaintiff's Section 1983 claims.

## ADOPTION ASSISTANCE ACT

Under the AAA, for a state to be eligible for federal matching funds for foster care expenditures, the state must have a plan for the provision of child welfare services approved by the Secretary of Health and Human Services. 42 U.S.C. § 671. The Court previously found, in denying Defendants' Motion to Dismiss as to Plaintiff's claim under the AAA, that the provision of the AAA allegedly violated in this case, Section 671(a)(16), creates rights that are enforceable under Section 1983. (Doc. No. 45).[31] The Court also previously found that the language of Sections 671 and 675 is mandatory. (*Id.*). Plaintiff alleges that Defendants violated the AAA by failing to place TH in facilities consistent with his individual needs and by failing to provide services in accordance with his individual plan. (Doc. No. 27).

The relevant statutory provision requires the development of a case plan for each child receiving foster care maintenance payments and provides for a case review system that meets AAA requirements with respect to each such child. 42 U.S.C. § 671(a)(16). Plaintiff contends that the hand-written, eight-page plan, called a DCS Family Permanency Plan, created by Defendants for TH (Doc. No. 68-11), fails to include all provisions required by the AAA. Specifically, Plaintiff argues that the case plan omits a description of the type of home or institution in which TH was to

---

[31] Defendants, citing additional (although not new) authority, reassert their argument that the AAA does not provide a private right of action for monetary damages. (Doc. No. 81). The Court declines to revisit its prior ruling in this regard. Defendants obviously will be able to bring the issue to the Sixth Circuit as appropriate, once this litigation is complete.

be placed or a discussion of the safety and appropriateness of the placement, as required under 42 U.S.C. § 675(1)(A). Plaintiff also asserts that Defendants failed to meet the case review system requirements found in 42 U.S.C. §675(5) by failing to modify the case plan to adapt to changing needs.

Under this statute, the "case plan" is a written document that must include, among other things, a description of the type of home or institution in which a child is to be placed, including a discussion of the safety and appropriateness of the placement and how the agency responsible for the child plans to carry out the voluntary placement agreement entered into or judicial determination made with respect to the child. 42 U.S.C. § 675(1)(A). The case plan must also include a plan for assuring that the child receives proper care and that appropriate services are provided to the parents, child, and foster parents. 42 U.S.C. § 675(1)(B).

Also under the AAA, "case review system" is defined as a procedure for assuring that each child has a case plan designed to achieve placement in a safe setting that is the least restrictive (most family like) and most appropriate setting available and in close proximity to the parents' home, consistent with the best interest and special needs of the child. 42 U.S.C. § 675(5)(A). The statute requires that the case review system include a procedure for assuring that the status of each child is reviewed periodically but no less frequently than once every six months in order to determine the safety of the child, the continuing necessity for and appropriateness of the placement, the extent of compliance with the case plan, and the extent of progress made toward alleviating or mitigating the causes requiring placement in foster care. 42 U.S.C. § 675(5)(B). Plaintiff alleges that these provisions clearly anticipate changing needs and that the case plans will be modified to adapt to those needs.

The permanency plan meeting for TH was held on November 14, 2016. (Doc. No. 76 at ¶ 8). Hillman testified that TH ran away again after that meeting but before the Juvenile Court hearing on December 12, 2016, held to consider approval of his plan. (Doc. No. 68-14 at 32-33 of 80). Hillman also stated that TH's plan was not changed to reflect his most recent runaway between the permanency plan meeting and the Juvenile Court hearing, and the court approved the plan. (*Id.* at 34 of 80). She agreed that, if circumstances change, a new meeting can be called, and the plan can be modified or changed to reflect those circumstances, but she did not know of any such changes to TH's plan. (*Id.* at 35 of 80).

The document referenced by Plaintiff is almost entirely blank. (Doc. No. 68-11). The information included simply identifies the child, the family services worker, the adjudication type (dependent/neglect) and the goal of returning TH to his parent by October 6, 2017. (*Id.*) There is no description of the type of home or institution in which TH will be placed or any discussion of the safety and appropriateness of the placement. Furthermore, there is no indication on this document that there is any plan for review of the case or the case plan provisions at all, much less to adapt to changing needs. (*Id.*).

Defendants argue that all federal mandates were complied with in TH's case plan and that an initial permanency plan and plan of care was entered for TH on December 12, 2016, citing to "Hillman Dep. Ex. 25," which the Court has found at Doc. No. 62. That document is an Order from the Juvenile Court of Davidson County, dated December 12, 2016, and is not the same as the DCS Family Permanency Plan filed by Plaintiff with her Response at Doc. No. 68-11. The Juvenile Court Order indicates that the next "permanency review" will be held in February 2017. (Doc. No. 62 at 7). The Order also states that the services and goals of the plan are reasonably related to the goal (return) in that "these services address the issues that led the child into foster care," which the

Court assumes, in this case, to be running away. (*Id.* at 4). The Order also lists certain responsibilities that are allegedly "set forth in the permanency plan," including mental health assessment and drug and alcohol assessment for TH, family counseling, a mentor for TH, and "REAL Program/Big Brother" for TH.[32] (Doc. No. 62 at 3).

Interestingly, the December 12, 2016 Juvenile Court Order provides that TH's current placement is DCS Level 1 (not Level 3), and the Order also states that placement at Level 1 is appropriate and in the child's best interest in that it is the "least restrictive placement where the youth's needs can be met." (*Id.* at 2). Yet such representations are obviously inconsistent with the fact that TH was placed at a Level 3 facility, even at the time this Order was entered.[33] The Court has seen no evidence that TH's plan, as reflected in this document and in the Juvenile Court Order, was ever updated to reflect a Level 3 placement. In other words, there is apparently no plan, and certainly no *approved* plan, to place TH in a Level 3 facility.

The Juvenile Court Order specifically approves and incorporates by reference "the initial Plan of Care signed by representatives of the Department of Children's Services and filed with this Court." (*Id.* at 6). Attached to the Order is a 20-page Family Permanency Plan, dated November

---

[32] The parties have not pointed the Court to any evidence of whether these services were provided to TH.

[33] As noted above, TH ran away after the November 16, 2016 meeting. He was apprehended and thereafter was placed at VYA (a Level 3 facility) on the day of or before the Juvenile Court hearing on December 12, 2016, on a "night-to-night" basis. Thus, Plaintiff was already physically placed at a Level 3 facility on December 12. Later VYA was made TH's long-term placement. (Doc. No. 68-15 at 137 of 216). So apparently he already had been placed in a Level 3 facility at such time as his plan and Court Order indicated that Level 1 was appropriate, and the plan and court order were never changed. This discrepancy is the reverse of the situation about which Plaintiff complains—that TH was in a Level 1 facility when he last ran away, instead of a more secure Level 3 facility.

14, 2016, similar, but not identical, to the eight-page document filed by Plaintiff at Doc. No. 68-11. [34]

The Family Permanency Plan attached to the Juvenile Court Order includes a description of DCS' concerns regarding TH's behaviors, which include running away. (Doc. No. 62 at 6 and 8). One of the listed "desired outcomes" is that TH will stop running away. (*Id*. at 8). The action steps include a notation that when TH stops running away, his guardian ad litem will pay for his AAU fees, apparently to play basketball. (*Id*.)

It is undisputed that after TH ran away from VYA and was returned on April 18, 2017, neither of the Defendants called a meeting for weeks—until May 8, 2017—and that TH was in a Level 1 foster home during that entire period. (Doc. No. 76 at ¶ 14). It is also undisputed that at the May 8, 2017 meeting, the team assessed that TH needed Level 3 services. (*Id.*). The case plan before the Court does not address the safety of placement, even if only temporary, in Mr. Welbeck's foster home in light of TH's recent runaways and gang activities. Thus, the case plan does not describe the type of facility in which TH was placed (Level 3), discuss any "temporary" placement, or discuss the safety and appropriateness of that placement, as required by the AAA (42 U.S.C. § 675(1)(A). If, as Plaintiff alleges and has supported with evidence of the case plan itself, the case plan stated that TH would remain at Level 1, and that plan was never changed despite his runaways, then certainly a reasonable jury could find that there was not a case plan designed to achieve placement in a safe setting. Moreover, a reasonable jury could find that there was not a case review system for TH that assured periodic review to adapt to any changing needs and determine the safety of the child.

---

[34] The document filed by Plaintiff (Doc. No. 68-11) appears to include only pages 1-3 and 15-19 of the document attached to the Juvenile Court Order filed by Defendant (Doc. No. 62).

There are genuine factual questions as to what Defendants did, and did not do, with regard to TH's required case plan and case review. For all these reasons, the Court finds that Defendants have not carried their initial burden to show that there are no genuine issues of material fact as to whether they violated the AAA in connection with TH's placement in DCS. Accordingly, summary judgment cannot be granted on this claim.

## **CONCLUSION**

For the reasons set forth herein, Defendants' Motion for Summary Judgment will be granted as to Count I and denied as to Counts III and IV. An appropriate Order will be entered.

_Eli Richardson_
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE